UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| JOHN M. RILEY, | ) | |
|---|---|---|
| | ) | No. 12 CV 4305 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,[1] | ) ) ) | |
| | ) | July 24, 2014 |
| Defendant. | ) | |

# MEMORANDUM OPINION and ORDER

John M. Riley suffers from gout, bipolar disorder, and other impairments. He filed applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act ("the Act"). An administrative law judge ("ALJ") awarded Riley SSI benefits beginning on his 50th birthday but denied his application for DIB. (Administrative Record "(A.R.)" 11-19.) After the Appeals Council declined to review the decision, Riley filed this suit seeking judicial review of the decision to the extent that it denied DIB. *See* 42 U.S.C. § 405(g). Before the court is Riley's motion for summary judgment seeking partial reversal of the Commissioner's decision and the Commissioner's cross-motion for summary judgment. For the following reasons,

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

Riley's motion is granted to the extent that the matter is remanded for further proceedings and the Commissioner's motion is denied:

## Procedural History

Riley first filed an application for DIB on June 6, 2007. (A.R. 11.) An ALJ denied that application on June 16, 2009. (Id.) Riley then filed a second application for DIB and SSI on May 25, 2010, renewing his claim that he became unable to work on October 31, 2005. (Id. at 137-42.) After his claims were denied initially and upon reconsideration, (id. at 61-64), Riley sought and was granted a hearing before another ALJ, (id. at 92-97). The ALJ held a hearing on June 14, 2011, at which Riley and a vocational expert provided testimony. (Id. at 26-60.) On October 6, 2011, the ALJ issued a decision finding that: (1) Riley was not disabled within the meaning of the Act as of December 30, 2010, the last date of his insured status, and thus was not entitled to DIB; and (2) Riley was disabled under § 1614(a)(3)(A) of the Act beginning on July 18, 2011, his 50th birthday, and was therefore entitled to SSI benefits as of that date. (A.R. 11-19.) When the Appeals Council denied Riley's request for review of the ALJ's denial of DIB, (id. at 135), the ALJ's decision became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On June 3, 2012, Riley filed the current suit seeking judicial review of the adverse portion of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

**Facts**

Riley worked for about 20 years in warehouses, performing job duties that included loading and unloading trucks. (A.R. 30-32, 52.) He stopped working in November 2008 because of his impairments. (Id. at 197.) He claims that he is unable to work because he suffers from gout, bipolar disorder, and anxiety disorder. (Id. at 72, 85, 86.) At his June 2011 hearing, Riley presented both documentary and testimonial evidence in support of his claim.

**A.  Medical Evidence**

Riley's medical records show that he was diagnosed with acute gout in November 2005. (A.R. 281.) He was under the treatment of Dr. Paul Baubly from November 2005 through February 2007 for gout, alcohol abuse, bipolar syndrome, and anxiety/depression. (Id. at 432-41.) Dr. Baubly's treatment records describe a swollen right wrist, anxiety, depression, and severe gout, and note multiple prescription medications. (Id.) Riley also sought treatment for anxiety in August 2006 from Dr. Cullinan. (Id. at 274.) Over the next year, Dr. Cullinan diagnosed Riley with bipolar disorder and prescribed additional medications. (Id. at 274-75.)

Riley visited Elmhurst Memorial Hospital ("Elmhurst") in February 2007 following a fall. (Id. at 334-36.) Later that year, Riley sought treatment from Dr. Jason Castator for gout. (Id. at 283.) In June 2007, Dr. Castator noted swelling and decreased range of motion in Riley's left great toe and adjusted Riley's medications. (Id.) During that time and into early 2008, Riley remained under

Dr. Baubly's care for treatment of high blood pressure, anxiety, and alcohol issues. (Id. at 421-29.) Riley reported suicidal thoughts to Dr. Baubly. (Id. at 423.)

Riley returned to Elmhurst in October 2008 after he vomited a brown or black material at home. (Id. at 340, 342, 346.) He reported to hospital staff that he had been experiencing intermittent episodes of vomiting over the past month. (Id. at 337, 340, 342.) While in the emergency room, he fell and hit his head. (Id. at 351.) A CT scan of the brain and of the cervical spine revealed no acute findings. (Id. at 347-49.) X-rays of the right wrist showed some chondrocalcinosis, which is also known as pseudogout. (Id. at 303.) A gastric biopsy showed signs of mild chronic gastritis. (Id. at 467.) After two days, he was discharged from Elmhurst with a plan to seek a GI consult and to follow an alcohol detox protocol. (Id. at 352.)

Riley continued to see Dr. Castator until 2010. (Id. at 307-18, 407-12, 413-19.) The records note gout flare-ups, pain, and anxiety. (Id.) Dr. Castator ordered x-rays of Riley's knees, lumbar spine, and wrists in late 2008. (Id. at 298-301.) The x-rays revealed mild degenerative changes in the knees, diffuse degenerative disc disease in the lumbar spine, and evidence of gout or pseudogout in the wrists. (Id.)

In October 2009, Dr. Castator wrote a letter in which he stated that he had been treating Riley for acute and chronic gout, bipolar disorder, depression, and anxiety. (Id. at 284, 368.) It was Dr. Castator's opinion that Riley was "unable to do physical or mental work-related functions due to his severe medical condition." (Id.) In April 2010, Dr. Castator responded to the state agency's request for a physician's medical evaluation of Riley. (Id. at 323.) Dr. Castator completed the

agency's form and indicated that Riley had "Full Capacity" to walk, bend, stand, stoop, sit, turn, climb, push, pull, speak, travel by public conveyance, engage in fine and gross manipulation, and perform activities of daily living during an eight-hour workday, five days a week, except that he had "frequent debilitating gout attacks which render[ed] him incapacitated." (Id. at 326.) Dr. Castator opined that Riley had the capacity to lift "[n]o more than 100 pounds at a time with frequent lifting of up to 50 pounds," and that Riley had no limitation in his ability to perform activities of daily living, social functioning, or in his ability to maintain concentration, persistence, and pace. (Id.) But he also noted that Riley had experienced four or more episodes of decompensation in the last 12 months. (Id.)

Also in April 2010, around the time that Riley's marriage ended and he was at risk of becoming homeless, Dr. Penepacker of a local mental health department evaluated Riley. (Id. at 474-82.) Dr. Penepacker diagnosed Riley with severe bipolar I disorder without psychotic features, generalized anxiety disorder, and alcohol dependence. (Id. at 481.) He assessed Riley's Global Assessment of Functioning ("GAF") at 45.[2] (Id.). According to a June 2010 progress note, Riley stopped drinking alcohol because of the gout attacks. (Id. at 484.) The progress notes from June, July, and August 2010 recorded Riley's complaints of mood swings,

---

[2] The GAF score is "a psychiatric measure of a patient's overall level of functioning." *Jelinek v. Astrue*, 662 F.3d 805, 807 (7th Cir. 2011). The GAF scale is on a scale of zero to 100, with 100 describing "[s]uperior functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Rev. 2000) ("DSM-IV-TR"). A score between 41 and 50 reflects "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

5

hearing voices, and increased gout pain, and indicated a GAF score of 45. (Id. at 489, 496, 502.) Dr. Castator's records from the last quarter of 2010 document further gout flare-ups. (Id. at 402-06.)

Dr. Laron Phillips, a psychiatrist, performed a consultative psychiatric evaluation on August 3, 2010. (Id. at 364-67.) Riley told Dr. Phillips that he started to suffer from depression in 2005 after he lost his job. (Id. at 364.) He has since become overwhelmed by the prospect of not being able to return to work because of the limitations caused by gout. (Id.) Riley claimed to have abstained from alcohol since 2005. (Id. at 365.) Dr. Phillips opined that Riley has a "history of chronic depressive symptoms that have resulted in moderate impairment in social, occupational and interpersonal functioning." (Id. at 366.)

A non-examining psychologist Lionel Hudspeth Psy.D. reviewed Dr. Phillips's report and the medical record for purposes of assessing whether Riley's mental impairments met or equaled an impairment listed in 20 C.F.R. § 404, Subpart P., Appendix 1. (Id. at 379-92.) Hudspeth evaluated Riley under Listing 12.04, entitled Affective Disorders, and Listing 12.06, entitled Anxiety-Related Disorders. (Id.) Regarding the "B" criteria of those listings, Hudspeth opined that Riley had mild restrictions in activities of daily living, mild restrictions in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and experienced no episodes of decompensation. (Id. at 389.)

Dr. Mahesh Shah conducted an internal medicine consultative examination on August 7, 2010. (Id. at 370-73.) Dr. Shah recorded Riley's complaint that since

6

2005, the gout in his toes, knees, and hands had worsened progressively. (Id. at 370.) He observed Riley walking slowly with a limp on the left side. (Id. at 371.) Dr. Shah found slow but full range of motion in the left hip and left knee with some discomfort, normal range of motion in other joints, and that Riley was unable to heel-walk or toe-walk on the left. (Id. at 372) Dr. Shah's clinical impression was that Riley had three problems: (1) gout, mostly affecting the left hip and knee, with gouty attacks in different joints, particularly in the big toes and right hand; (2) high blood pressure, which was under fair control; and (3) mental impairments. (Id. at 373.)

A state agency physician Dr. Reynaldo Gotanco reviewed Dr. Shah's report and the medical record. (Id. at 393-400.) Dr. Gotanco concluded that Riley was capable of occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, sitting, standing and/or walking for a total of about six hours in an eight-hour workday, and unlimited pushing and/or pulling. (Id. at 394.)

Riley returned to Dr. Penepacker in September 2010. (Id. at 509.) He complained of difficulty maintaining concentration, periods of rage, hearing voices, and pain associated with gout. (Id. at 504.) Dr. Penepacker assigned a GAF score of 46. (Id. at 509.) In a November 2010 disability report, Riley complained of ever-present suicidal thoughts. (Id. at 249, 251.) Dr. Penepacker's January 2011 progress note states that Riley continued to suffer from depression, anxiety, and nervousness, but that he denied hearing voices. (Id. at 546.) Riley's January 2011 GAF score was 46. (Id. at 549.) According to a May 2011 progress note, Riley was

7

walking slowly and complaining of being forgetful and easily aggravated, and maintaining a GAF score of 46. (Id. at 531.)

Dr. Castator completed a medical prognosis form on May 4, 2011, indicating diagnoses of anxiety, gout, chronic pain, and bipolar disorder. (Id. at 516.) He opined that Riley was not capable of full-time or part-time work despite medical treatment because of his chronic gout flare-ups. (Id.)

**B.     Riley's Testimony**

Riley testified that he had completed one year of college education. (A.R. 29.) From approximately 1985 through 2000, he worked at various companies in shipping and receiving functions. (Id. at 31.) Most recently, he unloaded and loaded trucks, which required lifting 50 to 75 pounds. (Id.) At previous warehouse jobs, he lifted between 50 and 100 pounds. (Id. at 32.)

Riley testified that he was first diagnosed with gout in 2005. (Id. at 34.) He said that Dr. Castator treats his gout with allopurinol, a drug that does not cause any side effects. (Id. at 33-35.) Riley testified that he suffers from gout flare-ups once every two weeks. (Id. at 33.) The flare-ups sometimes "go on for months." (Id. at 34.) During a flare-up, Riley's left leg and/or feet become numb, and/or his hands become painful. (Id.) The symptoms became more severe during the year preceding Riley's June 2011 hearing. (Id.) Riley also testified that the numbness in his left leg had become more prominent, and that since February 2011, the symptoms in his hands became more continuous. (Id. at 34-35.) Riley explained that many of his joints were constantly swollen. (Id. at 49.)

8

Riley sought mental health treatment in April 2010 at DuPage County Health. (Id. at 35.) He was diagnosed with bipolar disorder and anxiety. (Id. at 36.) His symptoms included "[m]ajorly depression, manic depression," difficulty with concentrating, thinking, and focusing, and some memory loss and paranoia. (Id.) Riley complained of feeling easily distracted, unable to sit and concentrate for four hours at a time, and having poor judgment as a result of impaired comprehension. (Id. at 46-47.) Riley explained that his physician diagnosed him with anxiety because of his complaints of feeling "on edge," and because he "would go off verbally and mentally without reason." (Id. at 37.) Riley continues to suffer from these symptoms despite medication. (Id.) He feels hopeless and helpless. (Id. at 48.) In one function report he submitted to the Commissioner, he complained of seeing visions and hearing voices. (Id. at 242.)

Regarding his physical limitations, Riley testified that he can walk about a block before having to stop because of pain. (Id.) The toe joints in his left foot are always swollen, and his left leg feels numb below the knee. (Id. at 49.) He can stand for a half-hour to an hour. (Id. at 37-38.) He has difficulty climbing stairs, squatting, and kneeling, but no problems with sitting. (Id. at 38.) Riley finds lifting grocery bags to be too strenuous, but he can lift a gallon of milk. (Id.) Riley explained that functionality of his hands is dependent on the severity of his gout attacks. (Id. at 39.) He estimated that for about six days a month, his hands are so symptomatic that he cannot write. (Id.) Even if he is suffering a gout attack, he can button his shirt and operate the steering wheel of a car. (Id. at 39-40.) The

pain associated with gout also impacts his sleep. (Id. at 40-41.) He rests for about a half-hour a day but does not nap. (Id. at 48.)

Riley discussed his activities of daily living. When his symptoms are most severe, he is capable of getting dressed, taking a shower, preparing simple meals, shopping for groceries, and doing laundry, but he cannot wash dishes, make his bed, vacuum, dust, mop, or sweep. (Id. at 41-42.) Riley watches sports on television, but he does not use a computer or read. (Id. at 43-44.) He tries to walk outside every day even though walking is painful. (Id. at 44, 50.) He does not leave the house to go to church, restaurants, movie theatres, or any other place in particular. (Id. at 43-44.) He stays at home most of the time and avoids crowds because they cause him anxiety and tension. (Id. at 45.) He shares a house with a roommate. (Id. at 29.)

## C. Vocational Expert's Testimony

Vocational Expert ("VE") Cheryl Hoiseth testified that Riley's past work included two jobs. (A.R. 52.) The first position, which involved the loading and unloading of trucks, is similar to a material handler position as described in the Dictionary of Occupational Titles. (Id.) The VE said that this position requires heavy exertion and is semi-skilled work. (Id.) She characterized Riley's second position as that of a warehouse worker, which requires medium exertion and is unskilled work. (Id.) Based on Riley's description of his warehouse work, the job required medium to heavy exertion. (Id.) The VE testified that Riley would not have any transferable skills from the material handler position. (Id.)

The VE also answered the ALJ's questions regarding the kinds of jobs someone with certain hypothetical limitations could perform. (Id. at 51-59.) The ALJ asked the VE to consider an individual of Riley's "age, education, and work experience who can lift and carry 10 pounds occasionally, less than 10 pounds frequently, stand and walk a total of two hours during an eight-hour workday, sit at least six hours during an eight-hour workday," "use the left lower extremity occasionally to push and pull and for operation of foot controls," and "is limited to three-to-four step, unskilled, simple repetitive routine tasks, should not come in contact with the public for work-related purposes, [and] can come into occasional contact with coworkers and supervisors." (Id. at 53-54.) The VE opined that this person would be capable of working as a hand packager or production worker. (Id.)

**D.    The ALJ's Decision**

After hearing the proffered evidence, the ALJ concluded that Riley is not disabled under §§ 216(i) and 223(d) of the Act. (A.R. 11-20.) In so finding, the ALJ applied the standard five-step sequence. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). In this case, the ALJ evaluated Riley's claim as of and subsequent to June 16, 2009, when Riley's first claim for DIB was denied. (A.R. 11.) At steps one and two, the ALJ concluded that Riley had not engaged in substantial gainful activity and had the following severe impairments: gout, degenerative joint disease, and a mood disorder with anxiety. (Id. at 13, 14.) At step three, the ALJ concluded that Riley's gout did not meet or medically equal any of the musculoskeletal impairments in the listings, nor did his mental limitations, which she characterized

11

as mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace, meet the criteria for any of the listed mental disorders. (Id.) Before moving to step four, the ALJ determined that Riley's residual functional capacity ("RFC") prior to July 18, 2011, his 50th birthday, was sedentary work, except that he could use his left lower extremity occasionally to push/pull, and that he was capable only of three- to four-step simple, repeated, routine tasks.[3] (Id.) The ALJ concluded at step four that since July 17, 2009, Riley has not been able to perform his former occupations. (Id. at 17.) At step five, the ALJ concluded that prior to Riley's 50th birthday, he was capable of performing the jobs of hand packager and production worker. (Id.) However, after his 50th birthday, he was no longer capable of transferring his job skills to other occupations. (Id.) Accordingly, she denied DIB but awarded SSI benefits as of Riley's 50th birthday. (Id. at 17-18.)

## Analysis

In his motion for summary judgment, Riley argues that the ALJ's step-three and RFC analyses are not supported by substantial evidence and the ALJ's decision should therefore be reversed. The court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and is

---

[3] In contrast, in the analysis of Riley's testimony and medical evidence, the ALJ limited Riley to sedentary work without any non-exertional limitations and without inclusion of the push/pull functionality in the left lower leg. (A.R. 16.) Similarly, when the ALJ restated the RFC, she again described Riley as retaining the ability to "perform the full range of sedentary work," without mentioning the non-exertional limitations and without including the push/pull functionality in the left lower leg. (Id. at 17.)

free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a comprehensive written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

A. **Step-Three Analysis**

Riley argues that the ALJ's step-three determination that his mental impairments do not meet a listing is not supported by the evidence.[4] Riley suggests that his impairments meet or equal the requirements for mental disorders found in the 12.00 series. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. For these disorders, the ALJ uses a "special technique" of rating the claimant's degree of functional limitation in four areas, which are also referred to as the "B criteria" of the 12.00 series: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R.

---

[4] Regarding the ALJ's step-three analysis of his physical impairments, the entirety of Riley's challenge is that the ALJ "referred to the 1.00 series but not to any specific section of that series." This argument is undeveloped and it is therefore deemed waived. *United States v. Thornton,* 642 F.3d 599, 606 (7th Cir. 2011) ("Undeveloped and unsupported arguments may be deemed waived.").

13

§ 404.1520a(a),(c)(3); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C. A claimant satisfies the requirements of listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), or 12.06 (Anxiety Related Disorders) if he has two marked ratings in any of the first three B criteria, or one marked rating with repeated episodes of decompensation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.04, 12.06.

In this case, the ALJ concluded that Riley has mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration, and thus did not have sufficient degrees of limitation to meet or medically equal the severity of any of the mental disorders in the listings. (A.R. 14.) The opinion does not refer to any medical records, testimony, or other evidence to support this conclusion, but rather states the conclusion without any analysis or explanation. (Id.)

Riley argues that the ALJ's opinion must be reversed because the ALJ provided no basis for her conclusion. Indeed, the Seventh Circuit has held that "in considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Kastner,* 697 F.3d at 647. In response, the Commissioner argues that the ALJ's error here is harmless because there is no medical evidence that undercuts the ALJ's B criteria findings.

14

The Commissioner suggests that there are only two pieces of medical evidence that are relevant to the listing analysis—the report of Dr. Phillips, the state agency reviewing psychologist, and the report of Dr. Hudspeth, the consultative psychiatric examiner. The Commissioner believes that both reports confirm the ALJ's ruling, but this court is not persuaded. Dr. Phillips opined that Riley had moderate impairments in social, occupational, and interpersonal functioning, (A.R. 366), which would suggest a greater level of limitation than the limitation the ALJ found. The ALJ did not explain why she deviated from this opinion. Perhaps the ALJ determined that Dr. Phillips's opinion was not entitled to much weight, but because the opinion omitted the required discussion about appropriate weight, this court is unable to meaningfully review that determination. *See* 20 C.F.R. §§ 404.1527(c), 416.927 (c)(2)-(6) ("Regardless of its source, we will evaluate every medical opinion we receive . . . we consider all of the following factors in deciding the weight we give any medical opinion."). The Commissioner's reliance on Dr. Hudspeth's opinion is also problematic because the ALJ does not cite to it anywhere in her decision, which suggests that the ALJ did not incorporate into her analysis. The agency's lawyers cannot defend the ALJ's decision on grounds that the ALJ herself did not embrace. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

Moreover, this court cannot adopt the Commissioner's suggestion that an ALJ would reach the same conclusion at step three on remand. *See Pepper*, 712 F.3d at 367 (The court "will not remand a case for further specification when we are

convinced that the ALJ will reach the same result."). Riley presented relevant medical evidence of his limitations that might have swayed the ALJ at step three had she considered it. For example, Dr. Castator, Riley's treating physician, twice opined that Riley is unable to do mental work-related functions due to his severe medical condition. (A.R. 284, 516.) While these opinions are on issues reserved to the Commissioner, 20 C.F.R. § 404.1527(d), they are suggestive of some level of mental limitation that ought to be considered in the assessment of the B criteria. Perhaps the ALJ believed Dr. Castator's opinion to be worth little weight under 20 C.F.R. § 404.1527(c)—she noted that Dr. Castator submitted a more favorable opinion of Riley's capabilities to the state agency[5]—but the ALJ included no discussion of appropriate weight. Other evidence of Riley's limitations can be found in Dr. Penepacker's records, which show consistent GAF scores of 45 and 46, and Dr. Baubly's records, which note suicidal ideation. (A.R. 423, 481, 484, 489, 496, 502.)

It is not the role of this court to reweigh the evidence or substitute its judgment for that of the ALJ. *Moore v. Colvin,* 743 F.3d 1118, 1121 (7th Cir. 2014). Without drawing a conclusion about the strength of Riley's claim, this court finds that the step three analysis "is so poorly articulated as to prevent meaningful review." *See Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Additionally, because the ALJ did not "confront the evidence that does not support [her]

---

[5] The ALJ described Dr. Castator's more favorable opinion as if it indicated no limitations in work functions. (A.R. 15.) In fact, Dr. Castator opined that Riley had experienced four or more episodes of decompensation in the last year and "has frequent debilitating gout attacks which render him incapacitated." (Id. at 326.)

conclusion and explain why it was rejected," *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004), the decision must be remanded.

B.      **Mental RFC Determination**

The opinion states that Riley retains the mental RFC to perform "three- to four-step simple repeated routine tasks."  (A.R. 14.)  But in the narrative description, the ALJ concluded that "[t]he record supports a finding that the claimant is [sic] can perform simple, unskilled work as a result of his mood disorder or anxiety."  (Id. at 16.)  Riley identifies two problems here: (1) neither RFC is grounded in the medical evidence; and (2) the ALJ did not explain her basis for equating "three- to four-step simple repeated routine tasks" with "simple, unskilled work."  The Commissioner responds that the ALJ's RFC assessment should be evaluated within the context of a third RFC, which was the RFC that the ALJ posed to the VE in her hypothetical.  That hypothetical described an individual limited to "three-to-four step, unskilled, simple repetitive routine tasks, [who] should not come in contact with the public for work-related purposes, [and] can come into occasional contact with coworkers and supervisors."  (Id. at 54.)

Even if this court were inclined to adopt the Commissioner's theory that the RFC posed to the VE is more relevant than the RFCs stated in the ALJ's opinion, the problem remains that the ALJ did not explain how she arrived at the conclusion that Riley remains capable of any of the three mental RFCs.  The ALJ acknowledged Riley's worsening depression, low GAF scores, and Dr. Phillips's finding that Riley suffers moderate impairments in social, occupational, and

17

interpersonal functioning, yet did not explain how these limitations related to any one of the three RFC conclusions. There is no discussion in the opinion of the mental acuity required for three- or four-step tasks, or the ALJ's basis for concluding that Riley maintained that acuity prior to his 50th birthday.

The Commissioner tries to rehabilitate the RFC analysis by reference to Dr. Hudspeth's finding that Riley could perform two- to three-step tasks. But because the ALJ did not rely on this report or mention it in the opinion, it is not a proper basis for defending the ALJ's conclusion. *See Chenery*, 318 U.S. at 87-88; *Parker*, 597 F.3d at 922. Moreover, Dr. Hudspeth's admonition that Riley retains the mental skills "for at least two to three step tasks," (A.R. 377), does not shore up the ALJ's conclusion that Riley is capable of more complex tasks.

## Conclusion

For the foregoing reasons, Riley's motion for summary judgment is granted to the extent that the matter is remanded for further proceedings and the Commissioner's motion is denied.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**